RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v.*

JOSHUA STARLING,

                *Defendant-Appellant*.

> No. 25-5440

---

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cr-00213-1—William Lynn Campbell, Jr., District Judge.

Argued: March 18, 2026

Decided and Filed: August 3, 2026

Before: SUTTON, Chief Judge, GRIFFIN, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Molly Rose Green, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Robert E. McGuire, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Molly Rose Green, Richard Thomason, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Robert E. McGuire, Nicholas J. Goldin, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

---

## OPINION

---

NALBANDIAN, Circuit Judge. Joshua Starling's bench trial ended with a conviction for being a felon in possession of a firearm. The district court also found that Starling's sentence warranted enhancement under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e).

But the indictment didn't include any allegation that ACCA would apply. So Starling raised two objections at sentencing: (1) that his previous drug convictions don't count as ACCA predicates as a matter of law because offenses under Tennessee law don't count under ACCA's definition of "serious drug offense"; and (2) that the government committed reversible error by failing to include ACCA allegations in the indictment. The first argument misreads Tennessee law; and Starling forfeited the second argument, entitling him to only plain-error review—on which his argument fails. For those reasons, we affirm.

## I.

Joshua Starling delivered mattresses. His path to that vocation was anything but soft and cushy. The multiple felonies and stints in prison he racked up made finding work difficult. And once he did find a job doing deliveries for his cousin's mattress store, trouble followed him. That trouble landed him with the firearm conviction and enhanced sentence on appeal here. The district court heard the facts of that story during a one-day bench trial as told below.

Starling worked for his cousin Chance Holt's mattress-delivery outfit, First Chance Furniture and Mattress. Holt testified that "it was a little rough" when Starling started out, but that he grew to be "great." R.67, Trial Tr., PageID 185. Starling ended up "handl[ing] pretty much all the day-to-day operations, collected the money, everything." *Id.* at PageID 186. And as part of that, Starling "did all the deliveries." *Id.* at PageID 185.

He often made trips to "rough" neighborhoods. *Id.* at PageID 188. While Starling's bad experiences started earlier on, they came to a head on May 10, 2021. On that day, Starling loaded up to deliver a mattress at a location he knew well: the site of his best friend's killing about a year earlier, an apartment complex called River Chase. When he arrived with his co-deliveryman, Corey Booker, Starling noticed a suspicious gathering of "young dudes" whom he feared might "rob [him and Booker] for whatever" they had. *Id.* at PageID 206–09. Starling worried that "the young guys . . . got something on them" because he could "tell by their waistband[s]" that they were carrying guns. *Id.* at PageID 208–09, 213. Indeed, he testified that the youths of concern at River Chase "got clips"—firearm magazines—that "look like a tower," or have very high capacities. *Id.* at PageID 207.

So Starling took precautions. For starters, he reverse-parked so that he could "pull straight out" in case any unsavory figures "r[a]n up on" him and Booker. *Id.* at PageID 205–06. And, most importantly for this case, he made the inadvisable choice to arm himself by borrowing one of Booker's guns. While that option is generally available to most citizens under the Second Amendment, it's a crime for those with prior felony convictions. *See* 18 U.S.C. § 922(g)(1).

Unfortunately for Starling, he and Booker weren't alone on their delivery route. Detectives with the Metro Nashville Police Department were tailing their van to serve an unrelated arrest warrant on Starling. They arrested him as he left his client's apartment and found the gun after searching him.

Based on that arrest and the later discovery of the gun in Starling's possession, a federal grand jury indicted him on one count of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). The indictment didn't include an allegation that Starling had committed three predicate offenses on separate occasions that would satisfy ACCA's requirement for an enhanced sentence.

Even though the indictment didn't mention ACCA, it came up repeatedly in the district court, starting from Starling's initial appearance. There, the magistrate judge warned Starling that, if he's "found to be an armed career criminal under federal law," he could be subject to the enhanced mandatory minimum sentence under ACCA. R.109, PageID 665–66. Starling's own filings, too, show that he knew the enhancement was in play. In his motion to dismiss his indictment, Starling acknowledged that he "has three prior felony convictions that appear to enhance his mandatory minimum sentence." R.43, Mot. to Dismiss Indictment, PageID 76–77. In his trial brief, too, Starling acknowledged that "[t]he government believes that [he] is an Armed Career Criminal for purposes of sentencing." R.55, Trial Br., PageID 138 n.3. Finally, during the bench trial, the government entered Starling's prior convictions into evidence without objection. They included (1) a 2004 drug offense, (2) a 2006 burglary, and (3) a 2011 drug offense. Immediately after finding beyond a reasonable doubt that those offenses occurred on different occasions, the district court asked if the parties had "[a]nything else for [it]" to consider on the issue. R.67, PageID 233. Starling offered nothing.

After trial, Starling raised two arguments against applying the ACCA enhancement at sentencing.  First, he argued that two of his three previous offenses can't qualify as ACCA predicates.  Those two convictions arose under Tennessee law banning the sale of cocaine.  And according to Starling, "cocaine" under Tennessee law means a broader range of substances than "cocaine" under federal law, so convictions under the former don't count as "serious drug offenses" under the latter.  R.76, Sent'g Mem., PageID 259–64.

Second, Starling argued that the indictment's silence on the ACCA enhancement violated his rights.  He raised that point for the first time more than six months after trial in a motion to continue his sentencing hearing.  In it, he argued that the Supreme Court's decision in *Erlinger v. United States*, 602 U.S. 821 (2024), published a little over two weeks after the bench trial, "suggests that the government cannot pursue an ACCA enhancement unless it submits the different occasions issue to a grand jury" and charges that element in the indictment.  R.87, Mot. to Continue Sent'g, PageID 412.  The district court granted Starling's motion to continue and set a briefing schedule for the parties to address Starling's *Erlinger* argument.

At the sentencing hearing, the district court considered Starling's arguments.  On the serious-drug-offense issue, it reasoned that the statutory provision under which Starling's prior convictions arose criminalized the same "cocaine" as federal law, rendering them predicate offenses for ACCA purposes.  R.108, Sent'g Hr'g Tr., PageID 552–58.  And as to the alleged indictment deficiency, it held that the argument should've been made before trial under Federal Rule of Criminal Procedure 12(b)(3)(B), which provides that an objection charging "a defect in the indictment" must be raised by pretrial motion.  *See id.* at PageID 558–61 (citing *United States v. Blair*, 214 F.3d 690 (6th Cir. 2000)).  Even putting that aside, it read *Erlinger*'s holding as "limited" to requiring "a jury [to] resolve the ACCA occasions issue," but not "whether ACCA [allegations] must be included in the indictment." *Id.* at PageID 558.  And because Starling had waived his right to a jury trial, he couldn't later turn around and complain that the ACCA elements weren't found by a unanimous jury.

After overruling both objections, the district court applied the ACCA enhancement and sentenced Starling to a within-Guidelines term of 210 months' imprisonment.  Starling appealed.

**II.**

**A.**

The weightiest issue in this appeal concerns whether Starling's previous convictions for drug crimes in Tennessee qualify as "serious drug offense[s]" under ACCA's three-strikes regime.  18 U.S.C. § 924(e).  Reviewing the matter de novo, we conclude that they do.  *United States v. Goldston*, 906 F.3d 390, 393 (6th Cir. 2018).

Under ACCA, defendants convicted of a § 922(g) violation are subject to a 15-year mandatory minimum sentence if they have "three previous convictions by any court . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another."  18 U.S.C. § 924(e)(1).

As relevant here, a "serious drug offense" for ACCA purposes means one that "involv[es] manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" as defined by the Controlled Substances Act's drug schedules.  *Id.* § 924(e)(2)(A)(ii); *see* 21 U.S.C. § 812 (drug schedules).

To determine whether a state drug offense counts under that definition, we take a "categorical approach, looking only to the statutory definitions of the prior offenses."  *Taylor v. United States*, 495 U.S. 575, 600 (1990).  If the "elements of the crime of conviction sufficiently match the elements of" a serious drug offense, the previous convictions count under ACCA.  *See Cartwright v. United States*, 12 F.4th 572, 576 (6th Cir. 2021).  But where the statute defining the crime of conviction is "divisible"—meaning that it "lists elements in the alternative such that the statute comprises multiple, alternative versions of the crime"—we modify the categorical approach slightly.  *United States v. House*, 872 F.3d 748, 753 (6th Cir. 2017).  In that situation only, we can consult *Shepard* documents (which include the charging document and state-court judgment, among others) for the "limited function" of "clarifying which element" of the divisible statute "played a part in the defendant's conviction."  *Goldston*, 906 F.3d at 394; *United States v. Schumaker*, 83 F.4th 1031, 1035 (6th Cir. 2023).

With that framework in mind, Starling argues that his three prior convictions don't count as serious drug offenses under ACCA. Why? Because, in his view, Tennessee law criminalizes more "cocaine" than federal law. Specifically, Tennessee's drug schedule includes "cocaine and . . . [its] isomers," Tenn. Code Ann. § 39-17-408(b)(4), whereas the federal schedule includes only "cocaine . . . [and] its *optical* and *geometric* isomers." 21 U.S.C. § 812 sched. II (emphasis added). In other words, because Tennessee's elements aren't a lesser-included subset of the elements of the "generic" ACCA offense (here, "serious drug offense[s]"), the district court erred by counting them under ACCA. *Cartwright*, 12 F.4th at 576 (citing *Taylor*, 495 U.S. at 599); 18 U.S.C. § 924(e)(2)(A).

Starling is wrong. To be fair, his premise—that Tennessee criminalizes more cocaine derivatives than the United States—might (or might not) be correct, but we don't need to resolve that here. That's for two reasons. First, Tennessee's drug penalty statute, Tenn. Code Ann. § 39-17-417, is "divisible," so we can consult the *Shepard* documents in Starling's state-court cases to determine the exact part of the statute that he violated. *See Goldston*, 906 F.3d at 394. Which leads to the second reason Starling's argument fails: Section 39-17-417(c)(1), the specific penalty provision that applied to him, punishes offenses involving cocaine itself (not any of its isomers—optical, geometric, or otherwise). So Starling's offense's elements categorically match "serious drug offense[s]" as defined by federal law. And even if we were convinced that the Tennessee statute is categorically broader than federal law, Starling hasn't shown a realistic possibility that Tennessee actually prosecutes rarely occurring, positional isomers. The upshot: Starling's Tennessee cocaine convictions count under ACCA. We address each point in turn below.

**1.**

The first step in the ACCA categorical analysis determines which version of that analysis controls: the baseline categorical approach or the "modified" categorical approach. *Pittman*, 736 F. App'x at 554. The latter is appropriate here.

A statute is divisible when it "lists elements in the alternative such that the statute 'comprises multiple, alternative versions of the crime.'" *House*, 872 F.3d at 753 (quoting *Descamps v. United States*, 570 U.S. 254, 262 (2013)).

Starling's previous convictions all arose under Tenn. Code Ann. § 39-17-417. At the time of his earliest conviction, the statute provided that:

> (a) It is an offense for a defendant to knowingly:
>
>> (1) Manufacture a controlled substance;
>>
>> (2) Deliver a controlled substance;
>>
>> (3) Sell a controlled substance; or
>>
>> (4) Possess a controlled substance with intent to manufacture, deliver or sell the controlled substance.

Tenn. Code Ann. § 39-17-417(a) (2003). We've already held that this part of the statute is divisible because each of subsection (a)'s paragraphs "sets out one or more of the offense elements in the alternative."[1] *Goldston*, 906 F.3d at 394. The rest of the statute's subsections further specify the exact punishments applicable when a defendant violates subsection (a) with respect to a particular type and quantity of controlled substance. As relevant here:

> (c) A violation of subsection (a) with respect to:
>
>> (1) Cocaine is a Class B felony if the amount involved is point five (0.5) grams or more of any substance containing cocaine . . . ; and
>>
>> (2)(A) Any other Schedule II controlled substance, including cocaine in an amount of less than point five (0.5) grams, is a Class C felony. . . .

Tenn. Code Ann. § 39-17-417(c) (2003).

Subsection (c) spells out different crimes. One need look no further than the two paragraphs quoted above. A § 417(c)(1) violator commits a different crime from a § 417(c)(2)(A) violator. The former violated subsection (a) with respect to at least half a gram of cocaine, constituting a Class B felony under state law. And the latter violated subsection (a) with respect to less than half a gram of cocaine or any amount of "[a]ny other Schedule II controlled substance," constituting a Class C felony under state law. The specific controlled substance

---

[1]That conclusion doesn't end the inquiry. Holding that subsection (a) is divisible only empowers courts to consult *Shepard* documents to determine which of *that subsection*'s paragraphs a defendant violated. The question here is more specific: which of subsection (c)'s paragraphs defined Starling's previous offenses. Only if subsection (c)'s paragraphs define different offenses can the court consult a defendant's *Shepard* documents to determine which paragraph the defendant violated.

involved must be proven beyond a reasonable doubt, constituting an element of the offense. *State v. Walker*, 29 S.W.3d 885, 892–93 (Tenn. Crim. App. 1999).  Different drugs, different amounts, different penalties:  different crimes.

We've reached the same conclusion when analyzing a similarly structured federal statute for divisibility.  In *United States v. Doggart*, we considered 18 U.S.C. § 247.  947 F.3d 879, 887 (6th Cir. 2020).  Like the statute here, § 247 starts off by listing different types of prohibited conduct.  *Id.*  And it goes on to "permit[] five different penalties depending on the offense elements the government proves, ranging from one year's imprisonment . . . to life."  *Id.* (citing 18 U.S.C. § 247(d)).  So because the government must prove (and a jury must find) those elements, the court deemed the penalty provisions to be divisible.  *Id.*  The same characteristic defines the statute here.  As Tennessee courts have explained, juries must find beyond a reasonable doubt that the "substance containing cocaine was one-half gram or more."  *Walker*, 29 S.W.3d at 892.  So here, as in *Doggart*, we can consider the defendant's *Shepard* documents to "determine 'which statutory phrase' formed the basis of the defendant's conviction." *Doggart*, 947 F.3d at 887 (quoting *Johnson v. United States*, 559 U.S. 133, 144 (2010)); *see also United States v. Jackson*, No. 23-1508, 2025 WL 80372, at *5–6 (6th Cir. Jan. 13, 2025) (considering statute divisible where the "exact substance [defendant] trafficked is an element of his prior conviction").

To put it more simply:  every relevant part of § 417 is divisible.  This circuit has held that subsection (a) is divisible because it defines the four types of prohibited top-level conduct— manufacturing, delivering, selling, or possessing with intent to do any of the foregoing, a controlled substance.  *See Goldston*, 906 F.3d at 394.  And subsection (c) is further divisible because its subparagraphs involve different drugs in different quantities with different penalties, spelling out different crimes.  So courts can refer to a defendant's *Shepard* documents to determine which specific controlled substance underlay a conviction under subsection (c).

Starling's counterargument relies on the Seventh Circuit's decision in *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020).  That case dealt with Illinois's drug-penalty statute, which, like Tennessee's, "set[s] forth various controlled substances and respective quantities that each constitute separate violations" of the law.  966 F.3d at 649.  Even so, the *Ruth* court concluded

that it was indivisible. *Id.* at 650. But Illinois' statute is structured in a subtly, but critically, different manner than Tennessee's. The subsection at issue in Illinois' statute specifies *one* penalty that applies to *multiple* different controlled substances. *See id.* at 649 (quoting 720 Ill. Comp. Stat. 570/401(c)). That's why the Seventh Circuit concluded that each numbered paragraph "is clearly indivisible"—all the separate drugs and quantities beneath the top-level sentence fall within the same penalty. *Id.* at 649–50. But § 417(c) doesn't group different controlled substances under the banner of a single penalty; it lists out different controlled substances affiliated with different penalties. So *Ruth*'s reasoning doesn't map onto Tennessee law. *Cf. Cradler v. United States*, 891 F.3d 659, 668 (6th Cir. 2018) (interpreting a different Tennessee statute and finding that, because "[t]he first paragraph of the statute contains a set of elements *and a penalty scheme* that are distinct from [the same] in the second paragraph," "the statute is divisible." (emphasis added)).

So because the indictments and state-court judgments in Starling's previous cases list his offense as involving "cocaine" in an amount greater than half a gram, constituting Class B felonies, we conclude that the offense statute is § 417(c)(1) under the modified categorical approach to ACCA.

**2.**

The "modified" part of the "modified categorical" approach tells us that Starling's convictions arose specifically under § 417(c)(1). Now for the "categorical" part: do the elements required to prove a § 417(c)(1) violation match the elements required to prove a "serious drug offense[s]" as defined by federal law? They do.

The only disputed element here is whether the "cocaine" referred to by § 417(c)(1) is the same "cocaine" that's listed in the federal drug schedules. And the only argument Starling presents to the contrary is that Tennessee law purportedly defines "cocaine" to include "all of its isomers." Appellant Br., p.29. The statute's plain text shows that to be false. As we explain above, § 417 criminalizes various offenses that all involve "controlled substance[s]." And state law defines "controlled substance" as "a drug, substance, or immediate precursor" enumerated in Tennessee's drug schedules. Tenn. Code Ann. § 39-17-402(4). As relevant here, the Tennessee

drug schedules in effect at the time of Starling's earliest offense *included*, but didn't *define*,[2] the following:

> Coca leaves (DEA Drug Code No. 9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (DEA Drug Code No. 9041) and ecgonine (DEA Drug Code No. 9180) and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances.

*Id.* § 39-17-408(b)(4) (2003).

That language shows that Tennessee's drug schedule doesn't use "cocaine" to mean the same thing as "cocaine *and* all its isomers." The Tennessee legislature explicitly separated the two substances in the state drug schedule. And as Tennessee's courts explain, "[i]n construing a statute it is the duty of the court to give every word and phrase meaning" without rendering any part of it "inoperative, superfluous, void, or insignificant." *Loftin v. Langsdon*, 813 S.W.2d 475, 479 (Tenn. Ct. App. 1991) (citing *United Canners, Inc. v. King*, 696 S.W.2d 525 (Tenn. 1985), *Tidwell v. Collins*, 522 S.W.2d 674 (Tenn. 1975)). So Starling's preferred definition of "cocaine" would render as surplusage the Tennessee legislature's explicit inclusion of cocaine's "isomers" in the drug schedule. That won't do.

Now consider the penalty statute. Starling's *Shepard* documents show that he was convicted specifically under § 417(c)(1). And that subsection only criminalizes violations with respect to "[c]ocaine . . . if the amount involved is point five (0.5) grams or more of any substance containing cocaine." Tenn. Code Ann. § 39-17-417(c)(1). So it only mentions "cocaine" and "substance[s] containing cocaine," *not* "cocaine and its isomers" and "substance[s] containing cocaine and its isomers."

---

[2]How do we know that the drug schedules, unless explicitly indicated, don't *define* the items they include? Because the Tennessee legislature included explicit definitions elsewhere for drugs it deemed merited such clarity. *See, e.g.*, Tenn. Code Ann. § 39-17-402(16) (defining "[n]arcotic drug" to "*mean*[] any of the following," including "isomer[s]" (emphasis added)). Courts must give weight to the legislatures' decision not to do the same for cocaine. And besides, as the district court noted, it'd be odd to treat the drug schedule entry including "cocaine" as a definition for "cocaine"—it's doubtful that the legislature would define a word using the word itself.

Driving the point home further, adjacent provisions show that the Tennessee legislature knows how to explicitly include isomers in other subsections of § 417 when it wants to. Consider, for example, § 417(c)(2), reproduced above. There, the legislature criminalized violations involving "[a]ny other Schedule II controlled substance." *Id.* § 39-17-417(c)(2). Cocaine's isomers are "other Schedule II controlled substances." *See id.* § 39-17-408(b)(4). And other subsections show even more clearly that the Tennessee legislature knows how to include "isomers" in a specific offense provision when it wants to. In § 417(i)(10), for example, the legislature criminalized offenses involving at least 26 grams of "any substance containing amphetamine or methamphetamine or any salt of an optical isomer of" those substances. So if the legislature wanted § 417(c)(1) to include "cocaine or its isomers," it would've done so.

Starling's counterarguments aren't persuasive. First, he relies on out-of-circuit caselaw that agrees with his desired outcome, but the reasoning in those cases either fails to convince or supports the government.

Consider *United States v. Myers*, an Eighth Circuit case interpreting Missouri law. 56 F.4th 595, 598–99 (8th Cir. 2022). Starling thinks that case supports his position, but it doesn't—and the Eighth Circuit's broader jurisprudence aligns with the government's position here. The *Myers* court held that Missouri's drug schedule—which lists cocaine and its "isomers"—and drug-penalty statute (i.e., Missouri's analogs to Tennessee's §§ 408 and 417) criminalized more conduct than their federal counterparts. *Id.* But that case doesn't control these facts. The Eighth Circuit itself explained why in a later case.

Three years after deciding *Myers*, the Eighth Circuit dealt with whether Arkansas's state drug laws were too broad to qualify as ACCA predicates. *United States v. Buckley*, 146 F.4th 679, 681 (8th Cir. 2025). And the Eighth Circuit continued to acknowledge what it said in *Myers*: that "where a state's definition of cocaine includes even one additional isomer, the state crime is categorically overbroad and cannot serve as an ACCA predicate." *Id.* (citing *Myers*, 56 F.4th at 598–99). But it noted a critical difference between Arkansas and Missouri law. *Id.* at 681–82. The latter was overbroad because the penalty statute criminalized distributing "a controlled substance." *Id.*; *see* Mo. Rev. Stat. § 195.211 (2000), *recodified at* § 579.055. And Missouri law elsewhere defined "controlled substance[s]" to include cocaine and its isomers.

*See Buckley*, 146 F.4th at 682 ("Missouri defined 'controlled substance' by incorporating its drug schedules."). Arkansas, on the other hand, did things the same way as Tennessee. Its penalty statute specifically criminalized possessing cocaine with intent to deliver. *Id.* at 680 (citing Ark. Code Ann. § 5-64-420(a)(1) (2011)). And its drug schedules didn't "purport to define; they purported to organize and list." *Id.* at 682. The same observations hold true with respect to Tennessee law. Unlike Missouri, Tennessee worded its penalty statute with respect to specific drugs, not by incorporating its entire drug schedule with a catch-all term. And like Arkansas, Tennessee didn't purport to define "cocaine" in its drug schedules. So we find *Buckley*, not *Myers*, to be persuasive here.[3] *See also United States v. Ferguson*, 163 F.4th 541, 545 (8th Cir. 2026) (explaining *Buckley*).

Second, Starling reads unpublished state caselaw to mean more than it can bear. Tennessee courts, on his reading, state that "cocaine" as used in § 417(c)(1) is "broad enough to encompass each substance" listed alongside it in the drug schedule. Appellee Br., pp.32–33 (citing *State v. Greene*, No. 119, 1990 WL 192007, at *3 (Tenn. Crim. App. Dec. 5, 1990)). That's not true. The *Greene* decision, which Starling relies on, analyzed Tennessee law when the state's drug schedules didn't list isomers at all. *See Greene*, 1990 WL 192007, at *3 (quoting Tenn. Code Ann. § 39-6-408(a)(4), which preceded § 39-17-408(b)(4)). So its holding has nothing to say on that front. And no other Tennessee court has cited the opinion in the 35-odd years since it issued.

**3.**

Finally, we decline to find Tennessee law overbroad because Starling has failed to show a "realistic probability" that Tennessee "would apply the [drug] statute to conduct broader than"

---

[3]This distinction also explains why Starling's reliance on a couple of other out-of-circuit cases is misplaced. Start with the Second Circuit's opinion in *United States v. Minter*, 80 F.4th 406 (2d Cir. 2023). *Minter* doesn't apply for the same reason as *Myers*: it involved a broadly worded penalty statute that incorporated all the drugs in the state's drug schedules, which included cocaine's isomers. 80 F.4th at 410–11 (quoting N.Y. Penal Law §§ 220.00(7), 220.39(1); N.Y. Pub. Health Law § 3306). So it goes for *Ruth*, the Seventh Circuit case dealing with Illinois law. The penalty statute at issue there targeted "cocaine" and "analog[s] thereof." 966 F.3d at 647 (quoting 720 Ill. Comp. Stat. 570/401(c)(2)). And under Illinois law, a substance is a controlled-substance analog if its "chemical structure . . . is substantially similar to the chemical structure of [the] controlled substance." 720 Ill. Comp. Stat. 570/102(f-5). So *Ruth* viewed cocaine's isomers as swept in by the penalty statute not because the state's drug schedule defined cocaine, but because the state's penalty statute swept broadly to include cocaine and any substance with a "substantially similar" chemical structure. *Id.*

the federal drug schedules.  *See United States v. Cervenak*, 135 F.4th 311, 326 (6th Cir. 2025) (en banc) (citation modified).  A defendant can show a realistic probability by pointing to his own convictions, or by citing other state cases in which the state prosecuted the conduct at hand. *See id.*  Starling has done neither, instead arguing that the realistic-probability test doesn't apply because "Tennessee's statutory language is plain" in its overbreadth.  Reply Br., pp.21–22.  For support, he cites our decision in *United States v. Cervenak*, which held that the test doesn't apply when the state statute's overbreadth is "plain."  135 F.4th at 326.  For all the reasons discussed above, the Tennessee statute is plain in the opposite direction—that is, § 417(c)(1) covers cocaine and not its isomers.  And even if we deemed the question a closer call than that, the realistic-probability test would apply, and Starling disclaimed any effort to meet it here.

\* \* \*

For all those reasons, we hold that Starling's previous offenses qualify as serious drug offenses under ACCA by applying the modified categorical approach.

**B.**

Starling advances two *Erlinger* arguments.  The first, garden-variety argument is that a jury had to unanimously find ACCA's occasions-different element fulfilled beyond a reasonable doubt.  We've dealt with that argument many times before.  *See, e.g.*, *United States v. Ballinger*, 155 F.4th 671, 673 (6th Cir. 2025).  But the other is novel—even though it inheres in every case that involves the garden-variety jury argument.  It's the argument that the government constructively amended the indictment by failing to charge ACCA's occasions-different element.

The run-of-the-mill *Erlinger* argument isn't a serious part of this appeal.  To start with, Starling merely notes it in passing, but focuses the balance of his brief on the constructive-amendment argument.  And issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed forfeited." *United States v. Johnson*, 79 F.4th 684, 706 (6th Cir. 2023) (citation modified) (quoting *United States v. Gray*, 692 F.3d 514, 521 (6th Cir. 2012)).  In any case, the jury-right variety of *Erlinger* error centers on the accused's right to have a factfinder find the ACCA occasions-different element beyond a reasonable doubt.

Starling had that here.  He waived his right to a jury trial, and the district court found the element beyond a reasonable doubt at the bench trial.

So the real dispute here centers on Starling's constructive-amendment *Erlinger* argument. To resolve it, we need to determine, and then apply, the proper standard of review.  Because Starling failed to timely raise his constructive-amendment argument, plain-error review is appropriate here.  And applying that standard, we hold that the government's failure to include ACCA allegations in the indictment didn't "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings," so there's no need to vacate and remand.  *United States v. Belcher*, 92 F.4th 643, 648, 651 (6th Cir. 2024) (citation modified).  We explain both conclusions below.

**1.**

We first pause to explain why plain-error review applies here.  The government argued as much in its brief, but Starling failed to state a standard of review in his opening brief or contest the government's plain-error standard in his reply.  *See* Fed. R. App. P. 28(a)(8)(B) (requiring, "for each issue, a concise statement of the applicable standard of review").  That said, he implicitly assumes a de novo standard in arguing for reversal with no deference to the district court's conclusions.  And to be fair, we've explained that we typically evaluate constructive-amendment arguments de novo, subject to Federal Rule of Criminal Procedure 52(a)'s harmless-error standard.  *See United States v. Kuehne*, 547 F.3d 667, 682–83 (6th Cir. 2008).  So it's worth explaining why we hold Starling to a higher standard here:  his failure to timely raise his argument before the district court.

To preserve a claim of error for appellate review, a party must object "when the court ruling or order" to which they object "is made or sought."  Fed. R. Crim. P. 51(b).  Otherwise, the objection only gets plain-error review on appeal.  *Id.* 52(b).  The requirement to timely object affords the district court "an opportunity to address the error in the first instance and allows this court to engage in more meaningful review."  *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004).  This "timely objection rule" requires a party to "make proper objection" when "the trial judge specifically invite[s] counsel to comment."  *Ross v. Burns*, 612 F.2d 271, 274 (6th Cir.

1980).  In essence, the rule "prevents a litigant from sandbagging the court" by "remaining silent about his objection" and keeping it in reserve to be raised "only if the case does not conclude in his favor" *Puckett v. United States*, 556 U.S. 129, 134 (2009) (citation modified).

Applying that requirement here, Starling failed to preserve his constructive-amendment objection for anything more than plain-error review.  After finding him guilty, the district court entered the second "phase" of trial, where it informed the parties that it'd hear evidence on the ACCA occasions-different element.  *See* R.67, PageID 231–32.  Once it heard the government's proof, it asked defense counsel if she had anything to place on the record, to which she responded "no."  *Id.* at PageID 232.  At that precise moment, the constructive amendment was complete:  everything that Starling needed to know about the difference between the indictment and the evidence was laid bare.  And his counsel declined to put on proof contrary to the government's—let alone object.

**2.**

Now to apply the plain-error standard.  To succeed, Starling must show (1) error, that's (2) plain and (3) affects "substantial rights." *Belcher*, 92 F.4th at 648 (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).  If he's met those three prongs, we "may then exercise [our] discretion" to address the error, "but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation modified).

Because the government conceded error, only the third and fourth plain-error prongs are in play.  And because Starling fails on the fourth prong, that's the only one we'll address.  *See United States v. Cotton*, 535 U.S. 625, 632–33 (2002) (courts "need not resolve" substantial-rights inquiry when the "error did not seriously affect the fairness, integrity, or public reputation" of the proceedings).

Starling hasn't shown that the government's *Erlinger* error seriously affected the fairness, integrity, or reputation of his proceedings for two reasons.

For one, the evidence that Starling's previous offenses took place on separate occasions "was overwhelming and essentially uncontroverted." *Cotton*, 535 U.S. at 633 (2002) (citation

modified). The three convictions—from 2003, 2006, and 2011—were too far apart in time to avoid the conclusion that they occurred on separate occasions. *See United States v. Campbell*, 122 F.4th 624, 629 (6th Cir. 2024) ("[T]he analysis can be limited to inquiries like whether the offenses were committed a 'day or more apart' or at 'significant' distances, factors that can singularly decide the question" (quoting *Wooden v. United States*, 595 U.S. 360, 370 (2022))). So there's "no basis for concluding" that the *Erlinger* error satisfied plain-error review's fourth prong. *Cotton*, 535 U.S. at 633.

And on top of that, Starling was on notice that ACCA was part of the case from his initial appearance onward. He didn't ignore the magistrate judge's warning at that hearing, either. In his motion to dismiss his indictment (on other grounds), Starling acknowledged that he "has three prior felony convictions that appear to enhance his mandatory minimum sentence." R.43, Mot. to Dismiss Indictment, PageID 76–77. In his trial brief, too, Starling acknowledged that "[t]he government believes that [he] is an Armed Career Criminal for purposes of sentencing." R.55, Trial Br., PageID 138 n.3. That's enough under the circuit's constructive-amendment caselaw. *See Belcher*, 92 F.4th at 651 ("Despite the fact that the superseding indictment was constructively amended, there is no question, looking at the record, that [the defendant] was aware that the government intended on charging him" under the ACCA).

For both those reasons, Starling's constructive-amendment challenge fails plain-error review's fourth prong, foreclosing relief on those grounds.

**III.**

For those reasons, we affirm.